AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 JAN 19 PM 3: 32

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |
| INFORMATION FROM CELLPHONE ASSIGNED CALL NUMBER 206-430-0799 | ) ) ) | 3 : 18 mj 036 |

SHARON L. OVINGTON

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | distribution of controlled substances |
| 21 USC s. 846 | conspiracy to distribute controlled substances and possess with intent to distribute controlled substances |

The application is based on these facts:

Attached Affidavit of Robert Buzzard

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert M. Buzzard*
*Applicant's signature*

Robert Buzzard, Special Agent of the FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-19-18

*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRIT OF OHIO

| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR TELEPHONE NUMBER 206-430-0799 THAT IS STORED AT PREMISES CONROLLED BY CELLCO PARTNERSHIP DBA VERIZON WIRELESS | Case No. ___3:18ᵐʲ___036___ <br><br> **Filed Under Seal** |
| --- | --- |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Robert M. Buzzard, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Cellco Partnership DBA Verizon Wireless, a wireless provider headquartered at 1800 Washington Valley Rd., Bedminster, NJ 07921.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since January 27, 2002.  I have been involved in narcotics related arrests; the execution of search warrants, which resulted in the seizure of narcotics; and supervised the activities of informants who provided information and assistance resulting in drug buys.  Since 2002, I received training and experience in interviewing and interrogation techniques; arrest, search and

seizure procedures; narcotics investigations; and various other criminal investigations resulting in successful prosecution. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting narcotics investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls or text messages from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. I have also encountered the practice of traffickers fielding calls from drug customers and directing those customers to "drug houses" which are used to store, package, and sell narcotics.

3.     The facts in this affidavit come from my personal observations, my training and experience and information obtained from other FBI Special Agents/Task Force Officers in the

Northern District of Ohio. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Joe Wright, and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.     In July 2017, your Affiant and members of the FBI's Southern Ohio Safe Streets Task Force (SOSSTF) began investigating a large-scale drug trafficking organization headed by Dayton, Ohio area resident Joe Wright. Investigation to date indicates Wright resides in the Dayton, Ohio area and supplies kilogram quantities of cocaine and heroin to known and unknown individuals in the Northern District of Ohio.

6.     More specifically, in July 2017 your Affiant was contacted by FBI Special Agent Michael Tom of the Cleveland Division. Special Agent Tom reported the Cleveland FBI and members of the Northern Ohio Law Enforcement Task Force (NOLETF) were investigating the drug trafficking activities of Wayne Nix and Kelvin Bedell in the Northern District of Ohio. During that investigation, members of NOLETF learned through court-authorized Title III wiretap intercepts, confidential reliable sources, GPS tracking of vehicles and telephones, and physical surveillance that Nix and Bedell were part of a sophisticated drug trafficking operation supplying kilogram quantities of cocaine and/or heroin to the Cleveland, Ohio, area.

3

7.      Special Agent Tom advised your Affiant that on or about June 27, 2017, the United States Marshals in the Northern District of Ohio arrested Kelvin Bedell pursuant to a federal probation violation warrant at 23351 Chagrin Blvd., Apt N-404, Beachwood, Ohio. During the arrest, Bedell gave Marshals consent to search his apartment and agents seized $32,507 and two cell phones. On June 27, 2017, United States Magistrate Judge William H. Baughman, Northern District of Ohio, signed a search warrant authorizing the forensic examination of the two cell phones in Bedell's possession at the time of his arrest. On June 27, 2017, NOLETF TFO Ryan Allen completed a forensic examination of the two cell phones. NOLETF members noted that one of the cell phones, assigned call number 216-548-7235, contained multiple stored text messages. Several of those text messages contained content associated with the distribution of illegal narcotics. Specifically, there were multiple stored text messages associated with the sale of illegal narcotics occurring between Bedell's cell phone number and cellular telephone number 207-289-4608. The text messages occurred between May 27, 2017 and June 26, 2017 and a sample of the text messages are transcribed in paragraphs 8 through 16 of this affidavit.

8.      On May 27, 2017, at approximately 7:20 p.m., cell phone number 207-289-4608 sent a text message to Bedell's cell phone, which read, "He probably give you some bricks for it." Your Affiant knows through training and experience working narcotics related investigations that the street term "bricks" refers to kilograms of illegal narcotics.

9.      On May 28, 2017, at approximately 11:00 a.m., cell phone number 207-289-4608 sent a text message to Bedell's cell phone, which read, "Im about to get back out the bed and see I have out testers yesterday and see if its worth dealing with." Your Affiant knows through

4

training and experience working narcotics related investigations that the street term "testers" refers to a sample of narcotics that a dealer provides to his/her customers to receive feedback on the quality of the illegal narcotics.

10. On May 28, 2017, at approximately 11:09 a.m., cell phone number 207-289-4608, sent a text message to Bedell's cell phone, which read, "Plus all that 1000 a gram shit tell your man neither one of you would be still in The game all would be rich as F." Your Affiant knows through training and experience working narcotics related investigations that the street term "1000 a gram" refers to the price of one gram of illegal narcotics (ie: $1,000 per gram).

11. On May 28, 2017, at approximately 12:42 p.m., cell phone number 207-289-4608, sent a text message to Bedell's cell phone, which read, "Ahki i sent a brick and 39 for real I do not play games with no one." Your Affiant believes through training and experience working narcotics related investigations that the user of cell phone number 207-289-4608 was telling Bedell that a kilogram (brick) of illegal narcotics and 39 grams of illegal narcotics were sent to Bedell.

12. On May 29, 2017, at approximately 11:44 a.m., cell phone number 207-289-4608, sent a text message to Bedell's cell phone, which read, "Plus i need my money off that brick i sent Yall have to straighten Yall hand." Your Affiant believes through training and experience working narcotics related investigations that the user of cell phone number 207-289-4608 was telling Bedell he still owed payment for a kilogram (brick) of illegal narcotics that the user of cell phone number 207-289-4608 previously supplied Bedell.

13. On June 4, 2017, at approximately 10:27 p.m., cell phone number 207-289-4608, sent a text message to Bedell's cell phone, which read, "And unc said you GOT your 39 grams when you claim it was short so stop playing it is what it is 61000." Your Affiant believes

through training and experience working narcotics related investigations that the user of cell phone number 207-289-4608 was telling Bedell that he knows Bedell received the kilogram plus 39 grams of illegal narcotics and still owed the user of cellular telephone number 207-289-4608 $61,000.

14.    On June 13, 2017, at approximately 9:10 a.m., Bedell sent a text message to cellular telephone number 207-289-4608, which read, "Yeah i went to sleep sis ah be there wen she off this week."  At approximately 9:11 a.m., cellular telephone number 207-289-4608 responded to Bedell with a text message stating "Cool."

15.    On June 17, 2017, at approximately 2:30 p.m., cellular telephone number 207-289-4608 sent a text message to Bedell's cell phone, which read, "Whats good its all good and pretty get at me asap him and her." Your Affiant knows through training and experience working narcotics related investigations that the street term "him" refers to heroin and the street term "her" refers to cocaine.  Your Affiant believes the user of cellular telephone number 207-289-4608 was telling Bedell the heroin and cocaine was good quality and Bedell needed to call as soon as possible.

16.    On June 17, 2017, at approximately 6:53 p.m., Bedell sent cellular telephone number 207-289-4608 a text message, which read, "I told u she comin tom."

17.    Special Agent Tom and members of the NOLETF believed based on their investigation and the text messages on June 13 and June 17 that Bedell was making arrangements to send a female (referred to in the text messages as "sis" and "she")  to meet the user of cell phone number 207-289-4608 and pick up illegal narcotics. Special Agent Tom of the Cleveland Division is aware through his investigation that Terri Buckner is a female who Bedell and members of his drug trafficking organization use to transport illegal narcotics and pickup or

6

drop off proceeds from illegal drug sales. Special Agent Tom also knows through wire intercepts, surveillance, phone records, and reliable confidential source information that Buckner possesses and uses cellular telephone number 216-849-8254.

18.     Toll data showed that on June 18, 2017, at approximately 11:12 a.m., cellular telephone number 207-289-4608, received an incoming telephone phone call from Buckner's cell phone number. Toll data showed that on June 18, 2017, at approximately 11:13 a.m., cellular telephone number 207-289-4608 placed an outgoing telephone phone call to Buckner's cell phone number. Toll data also showed cellular telephone number 207-289-4608 was in contact with Buckner's cell phone number on June 27, 2017, June 29, 2017, July 1, 2017, and July 9, 2017.

19.     On July 12, 2017, your Affiant obtained an order authorizing the acquisition of location information for cellular telephone number 207-289-4608. The order was authorized by United States Magistrate Judge Sharon L. Ovington, Southern District of Ohio. Your Affiant and members of the SOSSTF subsequently conducted physical surveillance in relation to the location information data for cellular telephone number 207-289-4608. Through those efforts, your Affiant and task force members identified Joe Wright as the possessor and user of cellular telephone number 207-289-4608.

20.     On or about July 26, 2017, local law enforcement officials conducted a traffic stop on Joe Wright in Dayton, Ohio unrelated to the aforementioned investigation. Following that contact, Wright discontinued use of cellular telephone number 207-289-4608. Through telephone call detail record analysis, your Affiant subsequently identified cellular telephone number 307-214-7625 as the replacement cell phone number Wright obtained after dropping the 207-289-4608 number.

21.     On September 21, 2017, United States Magistrate Judge Sharon L. Ovington authorized a pen register and trap and trace device on Joe Wright's cellular telephone number 307-214-7625.

22.     On October 26, 2017, pen register data showed Wright placed four telephone calls to Buckner's cell phone number.  Pen register data for that same date showed Wright's cell phone number sent two text messages to Buckner's cell phone number and Buckner's cell phone number sent two text messages to Wright's cell phone number.  Your Affiant believes the communication between Wright and Buckner on October 26, 2017 was in furtherance of drug trafficking activity.

23.     In my training and experience, I have learned Verizon Wireless retains stored text messages for a period of time.  On November 1, 2017, your Affiant served Verizon Wireless with a preservation request (pursuant to 18 U.S.C. Section 2703(f)) for stored text messages for the account associated with cellular telephone number 307-214-7625.

24.     On November 13, 2017, your Affiant obtained a federal search warrant for Verizon, the service provider for 307-214-7625, to produce stored text messages associated with the number.  Verizon complied with the warrant, and I reviewed the stored text messages that it produced.  My review confirmed that, during late October and early November 2017, Wright utilized cellular telephone number 307-214-7625 to facilitate drug trafficking activities.  For instance, I found the following drug-related text messages during my review:

25.     On October 26, 2017, Wright's cell phone, i.e, 307-214-7625, received a text message from cellular telephone number  513-952-1999 stating, "Ol girl whole one."  I know

8

through training and experience working narcotics related investigations that drug traffickers refer to cocaine as "girl" and a "whole one" as a kilogram amount. On October 26, 2017, Wright sent a text message back to cell phone number 513-952-1999 that stated, "31500." I know the current street price for a kilogram of cocaine is approximately $31,500.

26.    On October 28, 2017, Wright's cell phone sent consecutive text messages out to 20 different cellular telephone numbers stating, "Pretty." I know through training and experience working narcotics related investigations that drug traffickers send out mass text messages to their customers to describe the look or quality of a recently received shipment of illegal narcotics.

27.    One of the mass text message recipients was cellular telephone number 312-618-9589. After receiving the mass text message "Pretty" from Wright, 312-618-9589 responded with a text message that read, "OK." Later that same day (October 28, 2017), Wright sent another text message to 312-618-9589 that read, "Need to come get that money." 312-618-9589 responded with two text messages that read, "Ok" and "I bring it bout to leave my mom dinner."

28.    On October 30, 2017, Wright's cell phone sent a text message to cellular telephone number 323-972-2133 stating, "You got coke." I know through training and experience working narcotics related investigations that "coke" is another street term for cocaine. Following that outgoing text, cellular telephone number 323-972-2133 responded, "No." Wright then sent a text message to that same number stating, "I got some." 323-972-2133 responded with, "Ticket" (price). Wright responded, "What we been having for but I been fuckin them up with the  hook." 323-972-2133 responded, "Do you still got some of it how we split it up." Wright responded, "You can work some." 323-972-2133 responded, "We will chop it up."

9

29.     On October 31, 2017, Wright's cell phone again sent consecutive text messages out to 20 different cellular telephone numbers stating, "She ready and pretty." I believe through training and experience working narcotics related investigations that the text messages were letting Wright's customers know the shipment was in and it looked good.  Again, cellular telephone number 312-618-9589 was a recipient of the mass text.  That same day, cellular telephone number 312-618-9589 responded to Wright with a text that read, "Ok."

30.     On November 1, 2017, Wright's cell phone received a text message from cellular telephone number 937-270-6168 that read, "Fam I'm out here collecting the rest of this money I'll be ready in an hour or so man I have exactly 1100."  Your Affiant believes the sender of the text was advising Wright that he was getting money together to pay Wright for the purchase of illegal narcotics.

31.     In early December 2017, Wright's cellular telephone number 307-214-7625 stopped sending and or receiving text messages.  Your Affiant subsequently learned cellular telephone number 307-214-7625 had been deactivated.  Through telephone call detail record analysis, your Affiant subsequently identified Verizon cellular telephone number 206-430-0799 as the replacement cell phone number Wright obtained after dropping the 307-214-7625 number.

32.     Your Affiant reviewed call detail records for cellular telephone number 937-270-6168, a phone number previously identified through text message content as a drug customer to Wright.  The records indicated Wright's new Verizon cell phone number 206-430-0799 and 937-270-6168 had exchanged 16 text messages between December 25, 2017 and December 30, 2017.

10

33.     Your Affiant also reviewed call detail records for cellular telephone number 312-618-9589, a phone number previously identified through text message content as a drug customer to Wright.  The records indicated Wright's new Verizon cell phone number 206-430-0799 and 312-618-9589 had exchanged 29 text messages between December 15, 2017 and January 2, 2018.

34.     Based on the aforementioned call detail record analysis, you Affiant believes Wright is using new Verizon cell phone number 206-430-0799 to facilitate his drug trafficking activities through the use of text messaging and voice calls.

35.     On January 18, 2018, your Affiant served Verizon Wireless with a preservation request (pursuant to 18 U.S.C. Section 2703(f)) for stored text messages for the account associated with cellular telephone number 206-430-0799.

36.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless.  Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

37.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

11

38.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon Wireless for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

39.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

40.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.

The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

41.     Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

42.     Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing

13

digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

43.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

44.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access,

14

and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

45.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

46.     Based on the forgoing, I request that the Court issue the proposed search warrant.

15

47.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

### REQUEST FOR SEALING

49.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

_Robert M. Buzzard_

Robert M. Buzzard
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ Jan 19 _____, 201 8

_Sharon L. Ovington_

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with cellular telephone number 206-430-0799 that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 1800 Washington Valley Rd., Bedminster, NJ 07921.

## ATTACHMENT B

### Particular Things to be Seized

## I.  Information to be disclosed by Verizon Wireless

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless, including any messages, records, files, logs, or information that have been deleted but are still available to Verizon Wireless or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of  Title 21 U.S.C. §§ 841 and 846 involving Joe Wright and others since December 1, 2017 to the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Drug trafficking activity, including, but not limited to, the sale, distribution, storage of illegal controlled substances

(b) Lists of contacts and related identifying information;

(c) Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

(d) Any information related to transferring, transporting of currency to include banking information;

(e) Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

(f) Any information recording Wright's schedule or travel, such as the use of hotel rooms or other lodging, rental cars, or airline information; all bank records, checks, credit card bills, account information, and other financial records.

(g) Photographs, videos, digital files relating to, or concerning drug trafficking activity, including, but not limited to, pictures of illegal drugs, firearms, or currency

(h) Discussions concerning firearms, ammunition, or means used to protect drug trafficking activity

(i) Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

(j) Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

(k) Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

(l) The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).